## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ARTHUR L. HAIRSTON,      :   CIVIL NO: 1:11-CV-01379
                           :
       Plaintiff,       :
                           :   (Judge Jones)
   v.                   :
                           :
HARLEY LAPPIN, *et al.*,     :
                           :   (Magistrate Judge Schwab)
       Defendants.     :

## REPORT AND RECOMMENDATION

Before the Court is a motion to dismiss and for summary judgment filed by the defendants in this civil rights matter. For the reasons set forth herein, I recommend that the motion be granted.

## I.   Background.

### A. Procedural History.

On July 25, 2011, the plaintiff, Arthur Hairston ("Hairston"), a federal prisoner currently detained at the Allenwood Low Security Correctional Institution in White Deer, Pennsylvania ("LSCI Allenwood"), initiated this *Bivens*[1] action, under 28 U.S.C. § 1331, by filing a complaint. *Doc.* 1. In the complaint, Hairston

---

[1]    *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

named the following 18 defendants: (1) the Federal Bureau of Prisons ("FBOP"); (2) H. Lappin, Director at the Bureau of Prison's ("BOP") Central Office in Washington, D.C.; (3) H. Watts, the National Appeals Administrator at the BOP Central Office; (4) J.L. Norwood, the BOP Northeast Regional Director; (5) W. Scism, the Warden at LSCI Allenwood; (6) D. Zickefoose, the Warden at Federal Correctional Institution at Fort Dix, New Jersey ("FCI Fort Dix"); (7) Dr. J. Miller, a physician at LSCI Allenwood; (8) D. Spotts, the Assistant Health Services Administrator ("AHSA") at LSCI Allenwood; (9) R. Henry-Ali, a Physician's Assistant ("PA") at LSCI Allenwood; (10) A. Lopez De Salle, the Clinical Director at FCI Fort Dix; (11) Dr. S. Sulayman, a physician at FCI Fort Dix; (12) Dr. J. Chung, a physician at FCI Fort Dix; (13) Dr. Turner-Foster, a physician at FCI Fort Dix; (14) S. Syjontian, a PA at FCI Fort Dix; (15) J. Nash, the Warden at FCI Schuylkill; (16) Dr. Ronald Ross, a physician at FCI Schuylkill; and (17) – (18) "John Does," PAs at FCI Schuylkill. *Id.* at 1-5. In general, Hairston raised an Eighth Amendment claim against the defendants claiming that they were deliberately indifferent to his serious medical condition from 2001 to present. *See generally Doc.* 1. Hairston sought compensatory damages against each defendant. *Id.* He also filed two motions to proceed *in forma pauperis*. *Docs.* 2 & 5.

Thereafter, Magistrate Judge Smyser screened Hairston's complaint under 28 U.S.C. § 1915A. According to Judge Smyser, Hairston's complaint was

deficient in a number of respects.  *Doc.* 9 at 5.  In particular, Judge Smyser

determined that: (1) the complaint failed to state a claim against the FBOP,

because a *Bivens* action cannot be brought against a federal agency; (2) some of

Hairston's claims were barred by the statute of limitations; (3) Hairston failed to

allege personal involvement on the part of defendants Lappin, Watts, and

Norwood; and (4) the complaint violated Fed.R.Civ.P. 20(a).  *Id.* at 5-9.

Nevertheless, Judge Smyser gave Hairston leave to amend, and he granted

Hairston's motions to proceed *in forma pauperis*.  *Doc.* 9.

On August 31, 2011, Hairston responded to Judge Smyser's order,

strenuously objecting to it and making it clear that he planned on standing on the

allegations contained in his original complaint.  *Doc.* 10.  Thus, he re-filed his

complaint, which was docketed as an amended complaint, reasserting the same

claims against the same defendants.[2]  *See Doc.* 11.

Magistrate Judge Smyser then conducted a second screening analysis

recommending that: (1) the claims against the FBOP be dismissed because a

*Bivens* claim cannot be brought against a federal agency; (2) the claims against

Lappin, Watts, and Norwood be dismissed for Hairston's failure to allege personal

involvement and for failing to allege facts from which it could be reasonably

inferred that they were deliberately indifferent to his serious medical needs; (3) the

---

[2]     Hairston sues the defendants in their individual and official capacities.  *Doc.*
11.

claims about the level of medical care that he received at FCI Schuylkill from 2001 to 2004 were barred by the statute of limitations; and (4) that the claims against the defendants at FCI Fort Dix be severed and transferred to the District of New Jersey. *See Doc.* 14.

Subsequently, the Court reviewed Judge Smyser's report and recommendation, adopting it in part and denying it in part. *Doc.* 22. Specifically, the Court: (1) dismissed the complaint with respect to Lappin; (2) permitted the claims against Watts and Norwood to proceed through discovery to determine their level of personal involvement; (3) permitted the claims against the defendants at FCI Schuylkill to proceed because of "the possibility that the events that occurred at FCI Schuylkill might be considered related to later events to such an extent that they are part of a continuing violation"; and (4) declined to sever the FCI Fort Dix defendants. *See Doc.* 22. Additionally, the case was remanded to Judge Smyser for further proceedings. *Id.* No ruling was made with respect to Magistrate Judge Smyser's recommendation to dismiss the FBOP from the amended complaint. Two days later, Judge Smyser ordered the Clerk to serve Hairston's amended complaint (*Doc.* 24), and the defendants subsequently waived service.

After waiving service, the defendants filed an answer to Hairston's amended complaint on April 5, 2012.[3]  *Doc.* 64.  Then, after discovery closed on July 13, 2012 (*see Doc.* 48), the defendants filed a motion to dismiss and for summary judgment.  *Doc.* 107.  Following an extension of time, the defendants filed a brief in support, a statement of facts, and other documents.  *Docs.* 117, 118, 119, & 120.  Afterwards, Hairston filed a timely brief in opposition, an answer to the defendants' statement of facts, and other documents.  *Docs.* 128, 129, & 129-1.  The defendants did not file a reply brief and their time for doing so has since expired.  The motion, therefore, is ripe for disposition on the merits.

**B. Factual Statement.**

As stated, in his amended complaint, Hairston asserts that he is bringing this action against the defendants for violating his Eighth Amendment rights in that they failed to timely, adequately, and properly treat his pre-imprisonment medical condition relating to his back.  *See Doc.* 11 at ¶ 2.  According to Hairston, while

---

[3]    In the meantime, Hairston filed a slew of motions including a motion for recusal against Judge Smyser, a motion for summary judgment, a motion for preliminary injunction, and a motion to appoint counsel.  None of Hairston's motions affected the outcome of the case as reflected in the docket.  With respect to his motion to appoint counsel, however, Judge Smyser conditionally granted it by finding that the case appeared to be complex and likely required the use of expert witnesses.  *Doc.* 54 at 7-12.  Thus, Judge Smyser requested that the Panel Administrator for the Middle District's *Pro Bono* Program help find counsel to represent Hairston.  *Id.*  But, on June 4, 2012, the order was vacated, because the Panel Administrator informed the Court that no attorney could be secured.  *Doc.* 79.

imprisoned, the defendants (1) refused to provide him with Percocet, which he had taken for 17 years before being sentenced; (2) failed to act upon requests for medical treatment; (3) denied him medical treatment; (4) failed to follow the recommended course of treatment; and (5) denied him access to a physician "capable of evaluating the need for treatment." *Id.* at ¶¶ 31(a)-(e). The undisputed material facts reveal the following.

### 1. Hairston's Institutional Assignments.

On June 1, 2001, Hairston entered federal custody. *Doc.* 118 at ¶ 1. From October 9, 2001, to January 5, 2004, Hairston was imprisoned at FCI Schuylkill. *Id.* at ¶ 2. On January 5, 2004, Hairston was transferred to FCI Fort Dix where he was detained until May 12, 2010. *Id.* at ¶ 4. Hairston was then moved to LSCI Allenwood, where he remains in custody. *Id.* at ¶ 6. Since he was transferred to LSCI Allenwood, Hairston has not returned to either FCI Schuykill or FCI Fort Dix. *Id.* at ¶¶ 3, 5.

### 2. Hairston's Medical History at FCI Schuylkill.

On October 9, 2001, Hairston underwent an intake screening at FCI Schuylkill. *Id.* at ¶ 7. During the screening, Hairston revealed that he was taking Naproxen, Clonidine, and Elavil, and he also voiced complaints of back pain. *Id.* at ¶ 8, 9. Additionally, Hairston revealed that he was taking Percocet before being imprisoned and that Naproxen was not helping. *Id.* at ¶10. As a result, Hairston

received prescriptions for Naproxen, Clonidine, and Elavil, and he was added to the chronic care clinic ("CCC"). *Id.* at ¶ 11.

On October 16, 2001, Hairston was seen by Dr. Ross for complaints of pain "deep in his spine." *Id.* at ¶ 12. Dr. Ross' plan for Hairston's treatment included a follow-up by an orthopedic specialist, x-rays of his back, and he added Motrin to the list of Hairston's prescribed medications. *Id.* at ¶14, 15. Hairston, however, refused a refill prescription for Elavil and Naproxin. *Id.* at ¶ 13. Additionally, a request for an x-ray of Hairston's lumbar spine was submitted, and it was ultimately performed on October 22, 2001. *Id.* at ¶ 16, 17. The x-ray revealed that Hairston's "[v]ertebral alignment and intervertebral disc spaces [were] normal.…The vertebral bodies [were] of normal height. The paraspinous soft tissues [was] unremarkable." *Id.* at ¶ 18.

On October 25, 2001, Hairston was presented to health services with back pain and his medication was adjusted. *Id.* at ¶¶ 19, 21. Moreover, Hairston informed health services that he had a history with a herniated disc arising out of a car accident. *Id.* at ¶ 20. Four days later, on October 29, 2001, Dr. Ross submitted a written request for an orthopedic consultation by Dr. Perkins. *Id.* at ¶ 22. Thereafter, on November 7, 2001, Hairston was evaluated by Dr. Perkins, for his chronic low back pain. *Id.* at ¶ 23. Based on his evaluation, Dr. Perkins diagnosed Hairston with chronic lumbar degenerative disc disease ("DDD") and

drug dependency.  Further, Dr. Perkins recommended that Hairston be considered

for an analgesic replacement of Percocet.  *Id.* at ¶¶ 24, 25.

In early November 2001, Hairston submitted an Inmate Request to Staff

requesting that he be provided with the medication recommended by Dr. Perkins.

*Id.* at ¶ 26.  According to the defendants, however, in response to Hairston's

request, he was reminded about Dr. Perkins' diagnosis that he had a drug

dependency and of his refusal to accept the pain medication already offered to him.

*Id.* at ¶ 27.  Hairston was also informed that if he changed his mind he could sign

up for a sick call to start pain management treatment.  *Id.*  The next day, Dr. Ross

provided Hairston with information regarding another pain medication, but

Hairston refused it.  *Id.* at ¶¶ 30-31.  Moreover, the defendants point out that when

Hairston was evaluated for his high blood sugar, he indicated that "he could get his

blood sugar down if he could get his narcotic pain meds." *Id.* at ¶ 28.  It was also

documented that Hairston was very resistant to any suggestions other than narcotic

medications.  *Id.*  Similarly, on November 21, 2001, Hairston was seen by Dr. Ross

for complaints of pain in his back, hips, and legs, which he indicated had been

controlled by Percocet for 17 years.  *Id.* at ¶ 32.  Hairston, though, refused to

consider any other medication.  *Id.* at ¶ 33.  Moreover, Dr. Ross assessed Hairston

with chronic back pain syndrome, and wrote in his notes that Percocet could not be

provided "because of restrictions" at the prison.  *Id.* at ¶¶ 34-35.  Additionally, Dr.

Ross noted that a referral to a pain consultant should be considered and aggressive physical therapy would be the most beneficial treatment approach. *Id.* at ¶¶ 36-37.

Less than a week later, Hairston made additional complaints of back pain and, again, refused pain medication. *Id.* at ¶¶ 38, 39. Thereafter, Hairston was referred to a psychiatrist and to the regional medical director for evaluation. *Id.* ¶ 40.

On December 12, 2001, Hairston was again seen by Dr. Ross for complaints of constant pain in both his hip and back. *Id.* at ¶ 41. He claimed that he was having difficulty walking and requested a cane. *Id.* at ¶ 42. Hairston also referenced the need for Percocet, and he refused a pain management specialist. *Id.* at ¶¶ 43, 44. As a result, Dr. Ross prescribed Motrin and gave Hairston a cane. *Id.* at ¶ 45. Less than 45 minutes later, Dr. Ross observed Hairston walking from health services without limping.[4] *See id.* at ¶ 46.

---

[4]     Hairston attempts to rebut this particular claim by merely asserting that this is not true; however, he has not submitted a declaration, affidavit, or any other form of admissible evidence to dispute this statement of fact. *See Doc.* 129 at ¶ 46. In addition, like most of his denials, he fails to cite to relevant portions of the record supporting his position. As such, the defendants' statement of facts should be deemed uncontested and, therefore, undisputed. *See, e.g.*, *Bronson v. White*, NO. 1:05–CV2150, 2007 WL 3033865, at *1 n. 1 (M.D.Pa. Oct.15, 2007) ("Although Plaintiff has denied certain paragraphs of the Defendants' Statement of Material Undisputed Facts, he has not pointed to record evidence to support such denials. Therefore, pursuant to Local Rule 56.1, those material facts are deemed to be admitted.").

A month later, on January 15, 2002, Hairston went to health services and complained of back pains. *Id.* at ¶ 47. At that visit, Hairston's medication was adjusted. *Id.* at ¶ 48. Then, on February 1, 2002, Hairston again complained of back pain. *Id.* at ¶ 49. On that date, Hairston was educated on pain management and relaxation techniques, it was noted that he was obese, and his medication was adjusted. *Id.* at ¶¶ 50-52.

Subsequently, on March 4, 2002, and again on April 4, 2002, Hairston's prescriptions for Motrin were filled. *Id.* at ¶¶ 53, 54. Thereafter, on April 9, 2002, Hairston requested and was provided with a back support. *Id.* at ¶ 55. One month later, Dr. Ross resigned from the BOP for an undisclosed reason. *Id.* at ¶ 56.

After Dr. Ross resigned, Hairston made several more complaints of back pain. *Id.* at ¶¶ 57-60, 62, 65. Based on his complaints, the medical staff adjusted his medications, provided him with education on his condition, suggested a weight reduction plan that included the need for him to exercise, and advised him to elevate his legs. *Id.* at ¶¶ 61, 64, 66, 67, 69. On November 19, 2002, Hairston advised that he gained some relief by taking Motrin. *Id.* at ¶ 68.

Two months later, at the beginning of 2003, an x-ray of Hairston's spine and pelvis was completed due to his history of low back pain and pelvic nocturnal pain. *Id.* at ¶ 70. The radiology report, at that time, reflected that the L3-4 disc space was slightly narrowed and that the remainder of the lumbar spine and pelvic bones

were unremarkable. *Id.* at ¶ 71. As a result, on April 1, 2003, and May 19, 2003, Hairston was seen at the CCC, which included an orthopedic clinic. *Id.* at ¶¶ 72, 75. During those evaluations, Hairston's back condition was discussed, his medications were reviewed, and his obesity continued to be noted. *Id.* at ¶¶ 73, 74, 76.

On September 2 and December 11, 2003, Hairston was seen in the CCC, at which time his back condition and medications were reviewed. *Id.* at ¶¶ 77-80. It was further noted that Hairston "[was] seeking narcotic analgesics" and he threatened to seek an administrative remedy if he was not provided with Percocet or Tylenol for his back pain. *Id.* at ¶ 81. Approximately four weeks later, Hairston was transferred to FCI Fort Dix. *Id.* at ¶¶ 82, 89.

**3. Hairston's Administrative Remedy History at FCI Schuylkill.**

During his imprisonment at FCI Schuylkill, Hairston filed 20 administrative remedies, only two of which related to his medical treatment at the facility. *See id.* at ¶¶ 83, 88. Of the two administrative remedies he filed concerning his medical treatment, the first was on April 8, 2002, and the second, on April 22, 2002. *Id.* at ¶¶ 84, 86. The first remedy was rejected because it was filed at the wrong level, and the second was not appealed to the Regional Office. *Id.* at ¶¶ 85, 87-88.

### 4. Hairston's Medical History at FCI Fort Dix.

Hairston arrived at FCI Fort Dix on February 3, 2004. *Id.* at ¶ 89. His first recorded visit to the CCC at Fort Dix was March 2, 2004. At that visit, Hairston received an x-ray of his hips, pelvis, and lumbar spine. *Id.* at ¶¶ 90, 93. The report indicated Hairston's history of back and bilateral hip pain. *Id.* at ¶ 91. The x-ray impressions were normal. *Id.* at ¶¶ 92, 94-95. In addition, Hairston met with Dr. Foster to discuss his conditions, including Orthopedic Rheumatology. *Id.* at ¶ 96.

At the first visit, Dr. Foster noted Hairston's obesity and complaints of pain that increased in severity throughout the course of the day. *Id.* at ¶¶ 97-98. Moreover, Dr. Foster prescribed Indocin (a non-steroidal anti-inflammatory, antipyretic, and analgesic drug used to relieve pain, fever, and inflammation) and recommended that Hairston eat oatmeal four times per week, stretch five minutes per day, five days a week, and that he continue with aerobics four times per week. *Id.* at ¶¶ 99-100.

On June 1, 2004, and on September 14, 2004, Dr. Foster met with Hairston in the CCC, at which time it was noted that he had gained one pound, was still considered obese, and his prescription for Indocin was continued. *Id.* at ¶¶ 102-06. Several months later, on February 7, 2005, PA Syjongtian met with Hairston for complaints of pain. *Id.* at ¶ 107. Hairston's prescription for Indocin was refilled. *Id.* at ¶ 108. Moreover, PA Syjongtian issued Hairston an "Idle, Convalescent, and

Change in Word Classification Status" restricting him to "idle" status until February 10, 2005. *Id.* at ¶ 109. Then, on April 8, 2005, Dr. Foster met with Hairston again. On that occasion, Hairston informed Dr. Foster that his pain was a two or three on a scale of one to nine. In addition, Dr. Foster noted that Hairston had gained eight pounds. *Id.* at ¶¶ 110-12. Based on his condition, Dr. Foster continued the Indocin prescription and reiterated to Hairston that he should continue eating oatmeal, dieting, and exercising. *Id.* at ¶ 113.

On July 11, 2005, Dr. Foster met with Hairston on yet another occasion. *Id.* at ¶ 114. According to Dr. Foster's report, Hairston's subjective rating of pain was "None." *Id.* at ¶ 115. Still, Dr. Foster recommended that Hairston continue exercising, eating oatmeal, and remain on Indocin for pain. *Id.* at ¶ 116.

Months later, on February 13, 2006, for reasons undisclosed, Dr. Sulayman requested an MRI for Hairston. *Id.* at ¶ 119. According to the radiologist, the MRI revealed a posterior disc herniation as well as post-surgical changes of the spine, with a mild loss of vertebral body height. *Id.* at ¶ 120. Thereafter, Dr. Sulayman treated Hairston on several occasions from May to December 2006, and he continued Hairston on pain medication, educated him on dieting and exercising, and provided him with lifting restrictions. *Id.* at ¶¶ 121-22.

In April 2007, Hairston's Indocin was refilled and a new pain prescription (Piroxicam) was ordered. *Id.* at ¶¶ 123-24, 127. On April 16, 2007, Hairston

complained that the Piroxicam was having side effects and he requested that the medication be replaced with Motrin. *Id.* at ¶¶ 125-26. The following month, Hairston was prescribed Elavil to help alleviate pain. *Id.* at ¶¶ 128-29. Subsequently, in both June and December 2007, Dr. Sulayman met with Hairston. *Id.* at ¶¶ 130- 31, 135. At their June meeting, Hairston refused a physical examination. *Id.* at ¶ 132. Then, at their December meeting, Hairston informed Dr. Sulayman that his pain was only a two or three on a ten point scale. *Id.* at ¶ 135.

On July 29, 2008, Dr. Foster met with Hairston, at which time Hairston stated that he had "used all drugs except for ecstasy" before his imprisonment. *Id.* at ¶ 138. Hairston also informed Dr. Foster that he exercised daily, alternating between cardiovascular and strength training, that he did pull-ups, used a stair master, did dips, and played basketball. *Id.* at ¶¶ 139-40. Further, at the end of the visit, Hairston handed Dr. Foster an Inmate Request to Staff form requesting a narcotic for his lower back and hip pain. *Id.* at ¶ 141. Dr. Foster responded to Hairston's request in writing, stating that "[i]n this correctional setting especially and in any environment long term narcotic use to control pain associated with musculoskeletal etiology is inappropriate." *Id.* at ¶ 142. Instead, Hairston was prescribed non-narcotics for his back pain. *Id.* at ¶ 143.

Hairston was next seen by Dr. Chung, on February 2, 2009, at which time he continued to complain of low back pain and insisted on a strong pain killer. *Id.* at ¶¶145-46. He refused other medications. *Id.* at ¶ 147. Several months later, on July 22, 2009, Hairston was seen again by Dr. Chung. *Id.* at ¶ 149. According to his report, Hairston insisted on a narcotic for pain control, and he was both cynical and uncooperative. *Id.* at ¶ 150. Then, on August 18, 2009, it was noted that Hairston had refused his Elavil prescription because it was being crushed. *Id.* at ¶ 151. This occurred despite the fact that the pharmacist had twice explained that the medication needed to be crushed before giving it to him. Id. at ¶¶ 134, 152. As well, because he stopped taking that medication, his prescription for it was discontinued on September 19, 2009. *Id.* at ¶ 153.

After several weeks passed, PA Syjontian met with Hairston, who complained of back pain, and also indicated that the Idocin prescription was not helping. *Id.* at ¶¶ 154-55. Additionally, Hairston requested to see a neurosurgeon, stating that he had already discussed this with the attending physician. *Id.* at ¶ 157. In turn, PA Syjontian ordered a Ketoralac injection, submitted a request for Hairston to consult with a neurosurgeon, and explained the utilization review procedures for such a request with Hairston. *Id.* at ¶¶ 158-59. On December 1, 2009, Hairston returned to the CCC, made more complaints of back pain, and explained that he was seen by PA Syjontian, who gave him a toradol shot for pain,

but that the pain had become unbearable again by the afternoon. *Id.* at ¶¶ 160, 163. Accordingly, the Clinical Director, Dr. Lopez De Lasalle, was consulted and an order was placed for a daily Nalbuphine Hydrocholoride Injection. *Id.* at ¶ 164. The next day, however, Hairston returned to the CCC, reasserted his complaints of back pain, and ended up receiving a prescription for Acetominophen/Codeine. *Id.* at ¶ 166. Then, two days later, Dr. Chung reevaluated Hairston, who again complained of back pains, and a consultation with a neurosurgeon and an MRI was ordered. *Id.* ¶ 167-68. The next week, however, Hairston returned and met with PA Syjongtian, who noted that Hairston was self-medicating with the prescription medication Indocin. *Id.* at ¶¶ 169-70. Consequently, the Indocin was replaced with Gabapentin. *Id.* at ¶ 171.

Two weeks later, on December 28, 2009, PA Syjontian saw Hairston throwing his prescribed Gabapentin in the garbage. *Id.* at ¶ 174. Despite being educated on the need to take his medication, Hairston refused it, and the prescription was discontinued. *Id.* at ¶ 175.

In January 2010, Dr. Chung evaluated Hairston on a couple occasions, because he continued to complain about having back pain. *See id.* at ¶¶ 177, 178, 181, 185. According to Dr. Chung's notes, Hairston was not taking his pain medication, Hairston was still obese, he was walking normal, and he was able to progress through all range of motion without pain. *Id.* at ¶¶ 179, 182, 184, 186.

On March 8, 2010, an MRI of Hairston's lumbar spine was conducted and reflected considerable loss of intervertebral disc height. *Id.* at ¶ 187. According to Dr. Miller's declaration, the changes to Hairston's back are likely a combination of degeneration through the normal aging process, but it is accelerated due to posttraumatic changes from calcium and scarring. *Id.* at ¶ 188.

Two months later, Hairston was transferred to LSCI Allenwood, where he remains. *Id.* at ¶¶ 189, 199.

**5. Hairston's Administrative Remedy History at FCI Fort Dix.**

While Hairston was imprisoned at FCI Fort Dix, he filed 74 administrative remedies. *Id.* at ¶ 190. Only one of the administrative remedies that he filed related to his medical condition.

In particular, on December 21, 2009, Hairston submitted a Request for Administrative Remedy to the Warden complaining of severe leg and lower back pain which he claimed hurt whenever he walked or moved. *Id.* at ¶ 191. Hairston, therefore, requested medication, a first floor pass, examination by a medical specialist, and his immediate release from prison. *Id.* at ¶ 192. The remedy was denied in a response signed by Zickefoose. *Id.* at ¶ 193-94. Afterwards, on January 24, 2010, Hairston appealed the denial of his administrative remedy to the Regional Office, which, in turn, was denied on February 26, 2010. *Id.* at ¶¶ 195-96. The Regional Office's response was signed for Regional Director Norwood,

by someone else.  *Id.* at ¶ 197.  Subsequently, Hairston's final appeal to the Central Office was denied by Watts on July 21, 2010.  *Id.* at ¶ 198.

**6. Hairston's Medical History at LSCI Allenwood.**

Hairston arrived at LSCI Allenwood on May 20, 2010, and underwent an initial health screen wherein he disclosed having chronic back pain.  *Id.* at ¶¶ 199-201.  During the screen, his medications and medical history were also reviewed, and he was prescribed a new medication, Indomethacin.  *Id.* at ¶¶ 202-03.

In June 2010, PA Henry-Ali met with Hairston, who complained of back pains.  *Id.* at ¶¶ 210-11, 213.  Henry-Ali approved Hairston to see a neurosurgeon and gave Hairston a Toradol injection to help alleviate pain.  *Id.* at ¶ 212, 214-15.  Additionally, on July 2 and 15, 2010, Hairston was given two more injections at Henry-Ali's request.  *Id.* at ¶ 216-17.

Thereafter, on July 30, 2010, Dr. Miller met with Hairston, who was insistent on what course of treatment he desired.  *Id.* at ¶¶ 217-19.  Dr. Miller offered different medications to help control and manage Hairston's pain, but Hairston refused them.  *Id.* at ¶ 220.  Nevertheless, Dr. Miller compromised with Hairston and provided him with a daily Toradol injection for a period of 30 days.  *Id.* at ¶ 221.  Four days later, Hairston met with Dr. Miller again, to assess his medical problems.  *Id.* at ¶ 222.  During the visit, Dr. Miller discussed concerns about continuing the injections and suggested other options.  *Id.* at ¶¶ 223-24.

Hairston, however, was resistant to the new suggestions and stated that he believed the medical staff was being deliberately indifferent to his pain. *Id.* at ¶¶ 225-26. On the same day, shortly after meeting with Dr. Miller, Hairston went to sick call and was seen by another staff member. *Id.* at ¶ 228. Hairston told the staff member that (s)he was being deliberately indifferent to his pain, (s)he was discriminating against him, and he only wanted to be seen by PA Henry-Ali. *Id.* at ¶¶ 229-30. Moreover, Hairston refused to take his prescribed medication or to try an alternative medication for his pain. *Id.* at ¶ 231.

Thereafter, Hairston met with PA Henry-Ali three more times between September and November 2010 with complaints of back pains. *Id.* at ¶¶ 232, 235, 238. At those visits, Hairston refused to take medication offered to him, but he did receive at least one injection. *Id.* at ¶¶ 233-40. Also, Hairston requested to see a neurosurgeon, but he was already scheduled to see one in January 2011. *See id.* at ¶ 240.

On January 18, 2011, Hairston was evaluated by a neurosurgeon, who opined Hairston had a lumbar cyst, Lumbar Canal Stenosis, and severe degenerative lumbar disc disease. *Id.* at ¶ 243. The neurosurgeon advised Hairston to participate in physical therapy or else surgery was a possibility. *Id.* at ¶¶ 244-45.

Following his evaluation with the neurosurgeon, PA Henry-Ali submitted a request on January 25, 2011, for Hairston to undergo physical therapy. *Id.* at ¶¶ 246-47. A week later, Dr. Miller met with Hairston for over an hour, discussed Hairston's ongoing pain, discussed his concern about Hairston's continued use of Toradol injections, suggested alternative treatments, and explained that PA Henry-Ali's physical therapy request was referred to the Utilization Review Committee ("URC") for decision. *Id.* at ¶¶ 248-50, 252, 254. Hairston, though, refused to consider any of the treatment options available to him other than to state that it would be deliberately indifferent to not follow the neurosurgeon's recommendation. *See id.* at ¶ 251-52. Then, towards the end of February, PA Henry-Ali met with Hairston again for his complaints. *Id.* at ¶ 259. PA Henry-Ali offered Hairston Gabapentin to help alleviate the pain, but Hairston refused the offer due to a "controversial lawsuit." *Id.* at ¶¶ 260-61.

Subsequently, on March 10, 2011, Hairston was seen by a physical therapist, who attempted to demonstrate exercises that he could do for his back. *Id.* at ¶ 262. Hairston, though, was not attentive and stated that he could not concentrate because his hands were cuffed behind his back. *Id.* at ¶¶ 262-63. Instead of complying, Hairston requested hot rocks and an ultrasound machine to be used for the pain. *Id.* at ¶ 264. The physical therapist informed Hairston that those would not be options for the type of problems that he had with his back. *Id.* at ¶ 265.

Two weeks later, at the end of March, PA Henry-Ali submitted a request for follow up physical therapy and recommended that it be completed before April 7, 2011. *Id.* at ¶ 266-67. The URC, however, denied the request commenting that Hairston "refus[ed] basic step treatments." *Id.* at ¶ 269; *Doc.* 120-1 at 77.

On April 26, 2011, Hairston was seen by Dr. Miller in the CCC where his medical problems were discussed and reviewed. *Id.* at ¶ 270. Furthermore, it was noted that Hairston was not willing to try any of the changes to his medication that had been previously recommended by Dr. Miller. *Id.* at ¶ 271. Then, on May 10, 2011, PA Henry-Ali spoke to Hairston regarding his daily sick call requests and offered him other medication options to assist with managing his pain, but Hairston walked away and refused. *Id.* at ¶¶ 272-74. Though, on the next day, Hairston requested Motrin, and PA Henry-Ali prescribed it for him. *Id.* at ¶ 275.

On October 14, 2011, after Hairston had previously failed to report to health services to discuss long-term use of Motrin (*Id.* at ¶¶ 278-79), Hairston approached Dr. Miller about ordering Motrin because he was indigent. *Id.* at ¶ 283. Hairston told Dr. Miller that he understood the need for him to limit his use of Motrin and assured Dr. Miller that he does limit its use. *Id.* at ¶ 284. Thus, Dr. Miller provided him with a prescription for it. Id. at ¶ 285.

On October 25, 2011, Hairston was again seen by Dr. Miller at the CCC. *Id.* at ¶ 286. Dr. Miller requested a physical therapy consultation for Hairston, and the

request was approved. *Id.* at ¶¶ 287-88. Then, in the middle of December, Hairston saw a physical therapist. *Id.* at ¶ 294. The physical therapist showed Hairston several pelvic exercises, and noted that Hairston had little trouble walking. *See id.* at ¶¶ 295-96.

At the beginning of 2012, Hairston was next seen at sick call complaining of severe back pain, stating that he could not work, and reminding the staff about the neurologist's surgery recommendation if relief was not gained from physical therapy. *Id.* at ¶¶ 297-98. Additionally, Hairston requested a "permanent pass convalescence" from work, a library pass in order to work on his lawsuit, and a recreation pass to work on his physical therapy exercises. *Id.* at ¶ 299.

Thereafter, on February 1, 2012, Hairston met with the physical therapist again. *Id.* at ¶ 301. At the end of the meeting, the physical therapist requested a follow-up appointment in eight to twelve weeks. *Id.* at ¶ 302. Then, in March, Dr. Miller met with Hairston, who stated that he had been doing his physical therapy and was up to five different exercises. *Id.* at ¶¶ 303, 305-07. Two months later, Hairston saw the physical therapist again. *Id.* at ¶ 311. During this visit, the therapist noted that Hairston seemed disinterested in the program. *Id.* at ¶ 312.

Finally, according to Dr. Miller, future surgery may become necessary if increased neurologic symptoms, such as weakness or bowel or bladder dysfunction are presented, but it will only be offered if progressive problems make it necessary

and conservative treatment measures are ineffective.  *Id.* at ¶ 350.  In addition, Hairston continues to be followed by a neurosurgeon as part of his treatment, he continues to be seen in CCC, his diabetes is monitored daily, he has follow up appointments scheduled with a specialist, and he is currently being prescribed Motrin and Gabapentin for pain.  *Id.* at ¶¶ 348, 351-55.

### 7.  Hairston's Administrative Remedy History at LSCI Allenwood.

While imprisoned at LSCI Allenwood, Hairston has filed 52 administrative remedies concerning his detention there.  *Id.* at ¶ 314.  With respect to his medical complaints, on January 31, 2011, Hairston submitted an Informal Resolution Form complaining that, "[f]or 10 years now, the BOP and its staff have deliberately denied" the course of treatment recommended by Dr. Perkins.  *Id.* at ¶ 315. According to the defendants, in response, the Correctional Counselor replied that, AHSA Spotts informed him that Hairston had been seen by a neurosurgeon, who gave his recommendation for possible surgery and that he was scheduled to be seen by a physical therapist on their next visit.  *Id.* at ¶ 316.

On February 4, 2011, Hairston next submitted a Request for Administrative Remedy to the Warden asking that Dr. Perkins recommended course of treatment, from 10 years earlier, be provided immediately.  *Id.* at ¶ 317.  In response, Warden Scism denied Hairston's request.  *Id.* at ¶ 321. After his request was denied by Scism, Hairston timely appealed to the Regional Office.  *Id.* at ¶ 322.  The appeal,

which was signed for Norwood, by someone else, was denied. *Id.* at ¶¶ 323-24. Finally, Hairston made a timely final appeal to the Central Office, but it was also denied. *Id.* at ¶ 325-26.

## II. **Legal Standards.**

### A. Rule 12(b)(1).

"A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint." *Vieth v. Pennsylvania*, 188 F.Supp.2d 532, 537 (M.D.Pa. 2002) (quoting *Ballenger v. Applied Digital Solutions, Inc.*, 189 F.Supp.2d 196, 199 (D.Del. 2002)). When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006); *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

There are two types of Rule 12(b)(1) motions. A motion to dismiss under Rule 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *See Petruska*, 462 F.3d at 302 n. 3; *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *see also Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 227 F.3d 62, 69 (3d Cir. 2000). A "facial attack" assumes that the allegations of the complaint are true, but contends that the pleadings fail to present an action within the court's jurisdiction. *Mortensen*, 549 F.2d at 891. The motion should only be granted if it appears with certainty that the

court's assertion of jurisdiction would be improper. *Id.*; *Carpet Grp.*, 227 F.3d at 69.

The second form of a Rule 12(b)(1) motion is a "factual attack," which argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue, thereby causing the matter to fall outside the court's jurisdiction. *Mortensen*, 549 F.2d at 891. On a factual attack, the court must evaluate the merits of the disputed allegations, because "the trial court's ... very power to hear the case" is at issue. *Id.*; *Carpet Grp.*, 227 F.3d at 69; *Kenny*, 2009 U.S. Dist. LEXIS 8322 at *5–6, 2009 WL 276511 (citing *Berardi v. Swanson Mem'l Lodge No. 48 of Fraternal Order of Police*, 920 F.2d 198, 200 (3d Cir. 1990) ([I]n making its determination, the court is not confined to examining the face of the pleading, but may consider other evidence demonstrating the existence or lack of jurisdiction).

In short, on a facial attack, the allegations of the complaint are "taken as true." *Cohen v. Kurtzman*, 45 F.Supp.2d 423, 428 (D.N.J. 1999). In a motion attacking the factual existence of subject matter jurisdiction, however, "no presumptive truthfulness attaches to the allegations in the complaint." *Id.* Furthermore, when a motion under Rule 12 is based on more than one ground, the Court should consider the subject matter jurisdiction challenges first, because if it must dismiss claims for lack of subject matter jurisdiction, then all other defenses

and objections become moot. *See In re Corestates Trust Fee Litig.*, 837 F.Supp. 104, 105 (E.D. Pa. 1993).

## B. Rule 12(b)(2).

Rule 12(b)(2) provides for dismissal for lack of personal jurisdiction. Once a defendant has raised lack of personal jurisdiction as a defense, the burden to prove that jurisdiction exists in the forum state lies with the plaintiff; a court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 368 (3d Cir. 2002). However, a plaintiff must show "with reasonable particularity" enough contact between the defendant and the forum as to support a *prima facie* case in favor of the exercise of personal jurisdiction by the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1986); *Mellon Bank v. Farino,* 960 F.2d 1217, 1223 (3d Cir. 1992). Thus, a Rule 12(b)(2) motion "requires resolution of factual issues outside the pleadings, i.e., whether *in personam* jurisdiction actually lies." *Clark v. Matsushita Elec. Indus. Co ., Ltd.,* 811 F.Supp. 1061, 1064 (M.D.Pa. 1993) (quoting *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66 n. 9 (3d Cir. 1984)).

## C. Rule 12(b)(6).

Defendants have also filed a motion which, in part, seeks dismissal of the amended complaint on the grounds that Hairston has not stated a claim upon which

relief can be granted, as provided by Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion, however, goes beyond a simple motion to dismiss under Rule 12(b)(6) because it is accompanied by evidentiary documents outside the pleadings contravening Hairston's claims. Moreover, Rule 12(d) provides as follows:

> If, on a motion under Rule 12(b)(6) or (12)(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed.R.Civ.P. 12(d).

Here, the Court will not exclude the evidentiary materials accompanying the defendants' motion to dismiss because Hairston has also been given a reasonable opportunity to present material relevant to the motion. Thus, defendants' motion to dismiss for failure to state a claim and for summary judgment shall be treated solely as seeking summary judgment.

### D. Rule 56.

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed.R.Civ.P. 56(a), and for

which a trial would be "an empty and unnecessary formality." *Univac Dental Co. v. Dentsply Int'l, Inc.,* No. 07–0493, 2010 U.S. Dist. LEXIS 31615, at *4, 2009 WL 6315330 (M.D.Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248–49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 145–46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir. 2006); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is

appropriate. *Celotex,* 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. *Anderson,* 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252; *see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.,* 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." *Countryside Oil Co., Inc. v. Travelers Ins. Co.,* 928 F.Supp. 474, 482 (D.N.J. 1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact, which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." *Shelton v. University of Medicine & Dentistry of N.J.,* 223 F.3d 220, 223, n. 2 (3d Cir. 2000), citing *Stelwagon Mfg. v. Tarmac Roofing Sys., Inc.,*

63 F.3d 1267, 1275, n. 17 (3d Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgment, a court may only consider evidence which is admissible at trial, and that a party cannot rely on hearsay evidence when opposing a motion for summary judgment. *See Buttice v. G.D. Searle & Co.,* 938 F.Supp. 561 (E.D.Mo. 1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. *See Burgess v. Allstate Ins. Co.,* 334 F.Supp.2d 1351 (N.D.Ga. 2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. *Henry v. Colonial Baking Co. of Dothan,* 952 F.Supp. 744 (M.D.Ala. 1996).

*Bouriez v. Carnegie Mellon Univ.,* No. 02–2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug.26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. *See, e.g., Synthes v. Globus Medical, Inc.,* No. 04–1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); *Bouriez v. Carnegie Mellon Univ.,* No. 02–2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug.26, 2005); *Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc.,* 256 F.Supp.2d 249 (D.N.J. 2003). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by ... denying averments ... without producing any supporting evidence of the denials."

*Thimons v. PNC Bank, NA,* 254 F.App'x 896, 899 (3d Cir. 2007) (citation omitted).

Thus, "[w]hen a motion for summary judgment is made and supported ..., an

adverse party may not rest upon mere allegations or denial." *Fireman's Ins. Co. Of*

*Newark NJ v. DuFresne,* 676 F.2d 965, 968 (3d Cir. 1982), *see Sunshine Books,*

*Ltd. v. Temple University,* 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is

insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the

veracity of the opposing affidavit is also not sufficient." *Lockhart v. Hoenstine,*

411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56]

motion cannot expect to rely merely upon bare assertions, conclusory allegations

or suspicions." *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir. 1985) (citing *Ness v.*

*Marshall,* 660 F.2d 517, 519 (3d Cir. 1981)).

## III.  Discussion.

In their motion to dismiss and for summary judgment, the defendants raise

the following arguments: (1) the Court lacks subject matter jurisdiction over

Hairston's claims against the FBOP and the named defendants in their official

capacities, because of the doctrine of sovereign immunity; (2) the Court lacks

personal jurisdiction over Watts, Zickefoose, Lopez de Salle, Turner-Foster,

Chung, Syjongtian, and Sulayman for insufficient contacts; (3) Watts, Norwood,

Scism, Spotts, Zickefoose, and Nash lack personal involvement in the alleged

constitutional violation and cannot be held liable under *respondeat superior*; (4)

the claims against the defendants at FCI Schuylkill are barred by the statute of limitations; (5) Hairston failed to exhaust his administrative remedies relative to the medical treatment he received at FCI Schuylkill; (6) Hairston fails to state an Eighth Amendment claim in relation to his medical care; and (7) the defendants are entitled to qualified immunity. *See Doc.* 117 at 9. These arguments will be addressed *seriatim*, but because the Court's jurisdiction has been questioned, I am required to begin there.

### A. Defendants' Motion to Dismiss for Want of Jurisdiction.

#### 1. Subject Matter Jurisdiction.

The defendants have moved for dismissal under Fed.R.Civ.P. 12(b)(1), arguing that sovereign immunity bars Hairston's claims for money damages against the FBOP and the named defendants in their official capacities. *Doc.* 117 at 11-12. For the following reason, I agree and recommend that the defendants' motion to dismiss be granted in this respect.

Insofar as Hairston is suing the respective defendants for money damages, the law is clear that *Bivens* "only authorizes suit against federal officials in their individual capacities and not against the United States [or its] federal agencies." *Goodson v. Maggi*, 2010 WL 1006901, *7 (W.D.Pa. Feb. 22, 2010); *Debrew v. Auman*, 354 F. App'x 639, 641 (3d Cir. 2009) ("no claims [under *Bivens*] could properly be brought against Defendants in their official capacities.") (citation

omitted).  As such, the FBOP and named defendants in their official capacities

should be dismissed with prejudice based on the doctrine of sovereign immunity,

which strips the Court of subject matter jurisdiction over Hairston's claims for

money damages.  *See Johnson v. U.S. Attorneys*, CIV. A. 10-1643, 2010 WL

2991409, at *2-*3 (E.D.Pa. July 27, 2010).

### 2.  Personal Jurisdiction.

The defendants have also moved for dismissal under Fed.R.Civ.P. 12(b)(2)

arguing that Watts and the FCI Fort Dix defendants lack sufficient contacts to be

haled into court in Pennsylvania.[5]  *Doc.* 117 at 12-15.  Hairston provides no

argument or evidence to the contrary; therefore, based on the record before me, I

agree with the defendants.

"In deciding a motion to dismiss for lack of personal jurisdiction, we take

the allegations of the complaint as true." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d

1287, 1302 (3d Cir. 1996).  "But once a defendant has raised a jurisdictional

defense, a plaintiff bears the burden of proving by affidavits or other competent

evidence that jurisdiction is proper." *Id.* Additionally, "when the court does not

---

[5]     The defendants' objection to personal jurisdiction is timely under
Fed.R.Civ.P. 12(b).  After the Court ordered that Hairston's complaint be served
on them, the defendants waived service.  Thereafter, the defendants filed an answer
to Hairston's amended complaint on April 5, 2012, wherein they raised personal
jurisdiction as an affirmative defense.  *Doc.* 64 at 12.  Then, after discovery closed
on July 13, 2012 (*see Doc.* 48), the defendants filed this motion, their first
asserting any defense under Rule 12(b).

hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a *prima facie* case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

In addition to the relevant burdens of proof, Federal Rule of Civil Procedure 4(e) authorizes federal courts to assert personal jurisdiction over non-resident defendants to the extent permissible under the law of the state where the district courts sits. *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992). The forum state in this case is Pennsylvania, and its law permits courts within it to exercise jurisdiction "to the fullest extent allowed under the Constitution of the United States." 42 Pa.C.S.A. §§ 5322(b). The law also provides that jurisdiction "may be based on the most minimum contact with [the] Commonwealth allowed under the Constitution of the United States." 42 Pa.C.S.A. §§ 5322(b). Thus, the Court may properly exercise personal jurisdiction over the defendants in this matter as long as exercise of that jurisdiction does not violate due process. *Mellon*, *supra*, 960 F.2d at 1221.

In that regard, personal jurisdiction may be exercised either under the theory of general jurisdiction or under the theory of specific jurisdiction. First, "[w]hen a state has general jurisdiction over a party, that party can be haled into court in that state 'regardless of whether the subject matter of the cause of action has any

connection with the forum.'" *Pennzoil Products Co. V. Colelli & Associates*, 149 F.3d 197, 200 (3d Cir. 1998)(quoting *Farino*, *supra* 960 F.2d at 1221)). To establish general jurisdiction, "[a] nonresident's contacts with the forum must be 'continuous and substantial'…." *Id.* (quoting *Provident National Bank v. California Federal Savings & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir.1987)).

Here, Hairston has not alleged or established that Watts and the FCI Fort Dix defendants had the type of continuous and substantial contacts with Pennsylvania sufficient to support general personal jurisdiction. Accordingly, we turn to the question whether the Court has specific personal jurisdiction.

In determining whether this court may exercise specific personal jurisdiction we examine the relationship among the defendant, the forum, and the litigation. *Pinker v. Roche Holdings Ltd.*, 292 F .3d 361, 368 (3d Cir. 2002). "[T]he exercise of specific personal jurisdiction requires that the 'plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum.'" *Toys "R" US, Inc. v. Step Two, S.A.*, 318 F.3d 446, 451 (3d Cir. 2003)(quoting *Pinker*, *supra*, 292 F.3d at 368). Beyond this basic nexus, the Due Process Clause requires "(1) that the 'defendant ha[ve] constitutionally sufficient 'minimum contacts' with the forum, ... and (2) that 'subjecting the defendant to the court's jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Pinker*, *supra*, 292 F.3d at 368).

In connection with the relevant portion of the instant motion, Watts and the FCI Fort Dix defendants have submitted the declaration of Michael S. Romano, an attorney advisor at USP Lewisburg, in which he declares that such defendants neither own property nor conduct business in Pennsylvania.[6] *Doc.* 119 at 4. In opposition, Hairston fails to explain how, or provide evidence demonstrating that, these defendants have minimum contacts with this forum such that they would anticipate being haled into court here. *See Doc.* 128 at 25-26. In fact, with respect to the defendants at FCI Fort Dix, all of their alleged wrongful conduct occurred solely within the State of New Jersey, without any hint or suggestion of contact with the Commonwealth of Pennsylvania. As well, the only evidence of Watts' involvement in this case arose out of Hairston's final appeal to the Central Office, for the denial of his administrative remedy at FCI Fort Dix. Even assuming that fact alone created a sufficient minimum contact to hale Watts into this Court, that particular administrative remedy originated out of FCI Fort Dix, in New Jersey, and concerned Hairston's treatment there. Thus, none of the relevant defendants had sufficient minimum contacts with Pennsylvania, and, as such, I conclude that the defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(2) should be granted with respect to Watts and the FCI Fort Dix defendants.

---

[6] The Court may consider affidavits in determining the existence of personal jurisdiction. *See Patterson ex rel. Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990).

**B. Defendants' Motion for Summary Judgment.**

**1. Hairston's Claims against Norwood, Scism, Spotts, and Nash.**

Defendants Norwood, Scism, Spotts, and Nash argue that Hairston has failed to establish that they had personal involvement in his medical care for purposes of establishing a violation under the Eighth Amendment. In addition, they argue that Hairston's Eighth Amendment claims against them should be dismissed because *respondeat superior* cannot form the basis of a *Bivens* action.

In order to state an actionable civil rights claim, a plaintiff must plead two essential elements: (1) that the conduct complained of was committed by a person acting under color of law; and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995). Further, it is well established that personal liability under § 1983[7] cannot be imposed upon a government official based on a theory of *respondeat superior*. *See, e.g.*, *Rizzo v. Goode*, 423 U.S. 362, 368, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976). As well, in the Third Circuit, a defendant's personal involvement in alleged constitutional

---

[7]     *Bivens* actions are the federal counterpart to § 1983 claims brought against state officials. *Egervary v. Young,* 366 F.3d 238, 246 (3d Cir. 2004) (citing *Brown v. Philip Morris, Inc.,* 250 F.3d 789, 800 (3d Cir. 2001)). "[C]ourts have generally relied upon the principles developed in the case law applying Section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials." *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir. 1991).

deprivations is a requirement in a civil rights action, and a complaint must allege

such personal involvement. *Hampton*, 546 F.2d at 1082. The complaint must

show that each named defendant was personally involved in the events or

occurrences upon which a plaintiff's claims are based. *Id.* As the Court of Appeals

stated in *Rode v. Dellarciprete*:

> A defendant in a civil rights action must have personal
> involvement in the alleged wrongs.... Personal involvement can
> be shown through allegations of personal direction or of actual
> knowledge and acquiescence. Allegations of participation or
> actual knowledge and acquiescence, however, must be made
> with appropriate particularity. 845 F.2d 1195, 1207 (3d Cir.
> 1998) (citations omitted). Courts have also held that an allegation
> seeking to impose liability on a defendant based on supervisory
> status, without more, will not subject the official to section 1983
> liability.

*Id.* at 1208.

Here, I believe that Hairston has not sufficiently pleaded facts demonstrating

that Norwood, Scism, Spotts, and Nash were personally involved with the alleged

constitutional violation. As the defendants point out, "[p]articipation in the after-

the-fact review of a grievance or appeal is not enough to establish personal

involvement." *White v. Bledsoe*, No. 10-0146, 2011 WL 2292279, at *6 (M.D.Pa.

Jun. 8, 2011)(citing *Rode*, 845 F.2d at 1208 (finding that the filing of a grievance is

insufficient to show actual knowledge necessary for personal involvement)). The

situation would be different, however, if Hairston alleged facts showing that the

defendants participated in or acquiesced in the alleged constitutional violation, *see,*

*e.g.*, *Farmer v. Carlson*, 685 F.Supp. 1335, 1338 (M.D.Pa. 1988), but, liberally construed, I do not find that Hairston meets his burden. Additionally, the record reflects that Norwood was not even personally involved with denying Hairston's administrative remedy; instead, someone else, for Norwood, signed the denial. As such, the defendants' motion should be granted.

### 2. Hairston's Claims against the Defendants at FCI Schuylkill.

The defendants further move for summary judgment arguing that (1) Hairston's claims against the FCI Schuylkill defendants are barred by the statute of limitations and (2) Hairston failed to exhaust his administrative remedies. *Doc.* 117 at 19-26.

### a. Statute of Limitations.

With respect to the first issue raised by the defendants here, the statute of limitations applicable to a *Bivens* claim is the state statute of limitations for personal injury claims. *Lomax v. U.S. Senate Armed Forces Serv. Comm.*, 454 F. App'x 93, 95 (3d Cir. 2011). In Pennsylvania, the applicable statute is 42 Pa.C.S. § 5524(2), which provides a two-year limitations period. *See Fitzgerald v. Larson*, 769 F.2d 160, 162 (3d Cir.1985). The limitations period begins to run when the plaintiff knows or has reason to know of the injury that constitutes the basis for the action. *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir.1982) (per curiam).

Based on the date Hairston filed his complaint, in comparison to the dates

that he received treatment at FCI Schuylkill, his claims appear time barred. But, Hairston argues and alleges, however, that his claims are saved from the statute of limitations by the continuing violations doctrine, which is an "equitable exception to the timely filing requirement." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (quoting *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995)). My analysis, therefore, cannot end here.

Under the continuing violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Id.* (quoting *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)). The doctrine is a narrow exception to the statute of limitations that is frequently invoked but rarely found. *See Voices for Independence (VFI) v. Pa. Dep't of Transp.*, C.A. No. 06-78, 2007 WL 2905887 (W.D.Pa. Sept. 28, 2007).

Nevertheless, though it is rarely found, "[t]o establish that a claim falls within the continuing violations [doctrine], the plaintiff must do two things. First, he must demonstrate that at least one act occurred within the filing period: The crucial question is whether any present violation exists. Next, the plaintiff must establish that the [alleged wrong] is more than the occurrence of isolated or

sporadic acts." *West*, 45 F.3d at 755. In examining this second step, "courts should consider at least three factors: (1) subject matter-whether the violations constitute the same type ..., tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence-whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights." *Cowell*, 263 F.3d at 292 (citing *West*, 45 F.3d at 755 n. 9). The third factor, permanence, is the most important. *Id.* In considering this third factor, the court "must consider the policy rationale behind the statute of limitations. That is, the continuing violations doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims." *Id.* at 295. The burden is on the plaintiff to demonstrate that the continuing violations doctrine applies to toll the statute of limitations. *Id.* at 292.

Based on this standard, summary judgment should be granted for the FCI Schuylkill defendants because Hairston has not met his burden of demonstrating that his claims are saved by the continuing violation doctrine. In the amended complaint, the only named staff members at FCI Schuylkill are Ross and Nash.[8] There are no allegations that Nash ever provided Hairston with medical treatment, and the record reflects the same. *Doc.* 11 at ¶ 78. Additionally, while Hairston

---

[8] Hairston also raises a claim against "John Does 1 and 2," PA's at FCI Schuylkill, but they have yet to be identified.

claims that Ross treated him from 2001 to 2004 (*id.* at ¶ 81), the record reflects that Ross resigned from the FBOP in 2002 and provided no medical care to Hairston after his resignation. *See Doc.* 118 at ¶ 56. As well, on April 22, 2002, Hairston filed an administrative remedy complaining about the medical treatment he was receiving at the prison. *Id.* at ¶ 86. Therefore, at that time, he was aware that he disagreed with his medical treatment and had the facts necessary to put him on notice of the need to investigate his claims of deliberate indifference. Hairston did not act, however, and he was subsequently transferred to another prison in 2004. Last, his complaint was not filed until 2011. *See Doc.* 1.

In support of my decision, I believe that *Ozoroski v. Maue*, 460 F. App'x 94 (3d Cir. 2012) is instructive. In that case, Ozoroski was a state prisoner who brought an action under 42 U.S.C. § 1983, alleging that the prison health services and medical personnel deprived him of necessary medical treatment during his incarceration. *Ozoroski*, 460 F.App'x at 96. According to the Third Circuit's opinion, Ozoroski suffered a bowel perforation while imprisoned and underwent an operation in 1993. *Id.* He subsequently underwent multiple corrective surgeries, yet he continued to experience abdominal problems and developed a new illness. *Id.* Thereafter, Ozoroski repeatedly requested additional surgery to develop his issues, but the Pennsylvania Department of Corrections ("DOC") denied his requests. *Id.* Thirteen years after his initial surgery, Ozoroski was released to a

drug rehabilitation center and, while staying there, underwent another surgical procedure. *Id.* Later, Ozoroski filed his complaint in this Court, but summary judgment was ultimately granted under the statute of limitations despite Ozoroski's claim that the continuing violations doctrine saved his claims. *Id.*

Following the Court's grant of summary judgment, Ozoroski appealed to the Third Circuit. The Third Circuit, however, affirmed the Court's ruling given that one of the doctors had no authority to provide Ozoroski with medical care at the expiration of the doctor's contract, which had expired five years before the complaint was filed. *Id.* at 97. Additionally, the Third Circuit affirmed because (1) the conduct alleged against the other medical providers "was not connected to any 'continuing practice' but instead amounted to isolated incidents" and (2) Ozoroski had filed a grievance in connection with the level of care against another doctor causing the Third Circuit to find that the doctor's conduct was "sufficiently permanent to 'trigger [Ozoroski's] awareness of and duty to assert … rights' during the limitations period." *Id.* (quoting *Cowell*, 263 F.3d at 292).

Similarly, here, Ross had no medical authority over Hairston once he resigned, and Hairston provides no evidence to the contrary in support of the allegation contained in his complaint. Further, the defendants' conduct was sufficiently permanent to trigger Hairston's awareness of, and duty to assert, his rights during the limitations period once Hairston filed his administrative remedy

on April 22, 2002. Therefore, the defendants' motion for summary judgment should be granted.[9]

### 3. Hairston's Claims against the Defendants at LSCI Allenwood.

The remaining claims involve the LSCI Allenwood defendants, which are timely and properly before the Court. As stated, *supra*, Hairston asserts that he is bringing this action against the defendants for violating his Eighth Amendment rights in that they failed to timely, adequately, and properly treat his pre-imprisonment medical condition relating to his back. *See Doc.* 11 at ¶ 2. Specifically, according to Hairston, the defendants (1) refused to provide him with Percocet, which he had taken for 17 years before being sentenced; (2) failed to act upon requests for medical treatment; (3) denied him medical treatment; (4) failed to follow the recommended course of treatment; and (5) denied him access to a physician "capable of evaluating the need for treatment." *Id.* at ¶¶ 31(a)-(e). The defendants disagree by arguing that Hairston's claims do not rise to the level of deliberate indifference. *Doc.* 117 at 26-31.

The Eighth Amendment explicitly prohibits cruel and unusual punishment,

_____

[9] Having found that summary judgment should be granted based on the governing statute of limitations, it is unnecessary to delve into the exhaustion issue. I note, however, that I would recommend granting the defendants' motion with respect to their argument that Hairston failed to exhaust his administrative remedies, despite Hairston's argument that the administrative remedies were unavailable to him (*see Doc.* 128 at 14, 34), given that he had an opportunity to seek an extension of time for filing an appeal upon his transfer to another prison, *see* 28 C.F.R. § 542.14(b).

which includes the unnecessary and wanton infliction of pain by prison officials.

U.S. CONST. amend. VIII; *see also Rhodes v. Chapman*, 452 U.S. 337, 345-46, 101

S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct.

1078, 89 L.Ed.2d 251 (1986).  In order to sustain a claim against prison officials

for acting with deliberate indifference, two requirements must be satisfied:

> (1) "the deprivation alleged must be, objectively, sufficiently
> serious;" and (2) the "prison official must have a sufficiently
> culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834,
> 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and
> citations omitted). In prison conditions cases, "that state of mind
> is one of 'deliberate indifference' to inmate health or safety." *Id.*
> "Deliberate indifference" is a subjective standard under *Farmer*-
> the prison official-defendant must actually have known or been
> aware of the excessive risk to inmate safety.

*Beers–Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).

By including a subjective intent component in this Eighth Amendment

benchmark, the courts have held that a mere generalized knowledge that prisons

are dangerous places does not give rise to an Eighth Amendment claim. *See Jones

v. Beard*, 145 F. App'x 743 (3d Cir. 2005) (finding no Eighth Amendment violation

where inmate-plaintiff complained about cellmate who had a history of

psychological problems, but where plaintiff failed to articulate a specific threat of

harm during the weeks prior to an attack).  In short, when "analyzing deliberate

indifference, a court must determine whether the prison official 'acted or failed to

act despite his knowledge of a substantial risk of serious harm.' *Farmer v.*

*Brennan*, 511 U.S. 825, 841, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A prisoner plaintiff must prove that the prison official 'knows of and disregards an excessive risk to inmate health or safety.' *Id.* at 837." *Garvey v. Martinez*, 08–2217, 2010 WL 569852, at *6 (M.D.Pa. Feb.11, 2010).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish a violation of his constitutional right to adequate medical care in accordance with this standard, Hairston is required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," *White v. Napoleon*, 897 F.2d

103, 109 (3d Cir. 1990).

It is also clear, however, that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. *Estelle*, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. *Clark v. Doe*, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct.13, 2000) ("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. *See, e.g.*, *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')." *Gindraw v. Dendler*, 967 F.Supp. 833, 836 (E.D.Pa. 1997).

Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; *see, e.g.*, *Ham v. Greer*, 269 F. App'x 149 (3d Cir. 2008); *James*

*v. Dep't of Corrections*, 230 F. App'x 195 (3d. Cir. 2007); *Gillespie v. Hogan*, 182

F. App'x 103 (3d Cir. 2006); *Bronson v. White*, No. 05–2150, 2007 WL 3033865

(M.D.Pa. Oct.15, 2007); *Gindraw v. Dendler*, 967 F.Supp. 833 (E.D.Pa. 1997),

particularly where it can be shown that significant medical services were provided

to the inmate but the prisoner is dissatisfied with the outcome of these services.

Instead, courts have defined the precise burden which an inmate must sustain in

order to advance an Eighth Amendment claim against a healthcare professional

premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth
> Amendment claim, as it concerned [a care giver], because [the]
> allegations merely amounted to a disagreement over the proper
> course of his treatment and thus failed to allege a reckless
> disregard with respect to his ... care. The standard for cruel and
> unusual punishment under the Eighth Amendment, established
> by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 104, 97
> S.Ct. 285, 50 L.Ed.2d 251 (1976), and its progeny, has two
> prongs: 1) deliberate indifference by prison officials and 2)
> serious medical needs. "It is well-settled that claims of
> negligence or medical malpractice, without some more culpable
> state of mind, do not constitute 'deliberate indifference.'" "Nor
> does mere disagreement as to the proper medical treatment
> support a claim of an eighth amendment violation." .... [The
> inmate] alleged no undue delay in receiving treatment and, as the
> district court noted, the evidence he presented established that he
> received timely care.... Although [an inmate plaintiff] may have
> preferred a different course of treatment, [t]his preference alone
> cannot establish deliberate indifference as such second-guessing
> is not the province of the courts.

*James*, 230 F. App'x. at 197–198. (citations omitted).

In short, in the context of the Eighth Amendment, any attempt to second-

guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

There is a necessary corollary to this principle, limiting the reach of the Eighth Amendment in a prison medical setting. In a case such as this, where the plaintiff's complaint reflects that an inmate received some level of on-going medical care, it is also well-established that non-medical correctional staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir.1993). The rationale for this rule has been aptly explained by the United States Court of Appeals for the Third Circuit in the following terms:

> If a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not

> treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

*Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

Applying this standard, courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims. *See, e.g.*, *Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006); *Spruill v. Gillis*, *supra*; *Durmer v. O'Connor*, *supra*; *Garvey v. Martinez*, No. 08–2217, 2010 WL 569852 (M.D.Pa. Feb.11, 2010); *Hodge v. United States*, No. 06–1622, 2007 WL 2571938 (M.D.Pa. Aug.31, 2007).

Here, the defendants do not dispute that Hairston had a serious medical need. In fact, the undisputed evidence demonstrates that Hairston has a long history of back pain. At the same time, however, the record is replete with instances where Hairston met with physicians and medical staff at LSCI Allenwood, including a neurosurgeon; he was also prescribed medication to manage his pain; he was given opportunities to participate in physical therapy; alternatives were discussed with him; his diabetes was monitored daily; he was provided with x-rays and MRI's; and he was provided with injections for pain. At no time does the record reflect that any of the physicians or medical staff at LSCI

Allenwood turned their backs on Hairston or refused to provide him with any form of treatment. Instead, Hairston complains about the level of care and treatment that he received. But, some significant level of medical care was offered to him, and his claims should be denied on that basis alone. Moreover, as stated above, none of the non-medical prison staff can be held accountable given that he remained under constant care and supervision of medical professionals.

Last, with respect to his complaint that he was not provided with Percocet, which he was prescribed before his imprisonment, his claim still fails as a matter of law. *See, e.g.*, *Abdul–Wadood v. Nathan*, 91 F.3d 1023, 1024–35 (7th Cir. 1996) (inmate's disagreement with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (prisoner's claim that Motrin medication was insufficient and that stronger pain medication was required for his wrist injuries did not state a deliberate indifference claim); *Reyes v. Gardener*, 93 F. App'x 283, 285 (2d Cir. 2004) (defendants' decision to prescribe Tylenol or Motrin to manage prisoner's pain and to administer Demerol or Morphine only when necessary did not constitute deliberate indifference); *Harris v. Westchester Cnty. Med. Ctr.*, No. 08 Civ. 1128, 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) ("The failure to provide stronger pain medication does not constitute deliberate indifference."); *Wright v. Genovese*, 694 F.Supp.2d 137, 160 (N.D.N.Y. 2010) ("Differences in

opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs."); *Veloz v. New York*, 339 F.Supp.2d 505, 525 (S.D.N.Y. 2004) (medical providers' decision not to prescribe stronger pain medication than Tylenol to address prisoner's back condition did not state a claim for deliberate indifference); *Ortiz v. Makram*, No. 96 Civ. 3285, 2000 WL 1876667, at *9–10 (S.D.N.Y. Dec.21, 2000) (doctor's decision to prescribe Motrin in lieu of Percocet for prisoner's medical condition did not amount to deliberate indifference, even when that decision contravened recommendation of specialist). And, while surgery was recommended, but delayed to await the effects of other forms of treatment, his disagreement with the medical staff that he was in need of surgery also fails to establish deliberate indifference. *See Czajka v. Caspari*, 995 F.2d 870, 871 (8th Cir. 1993) (holding that an inmate's mere disagreement with doctor's informed decision to delay surgery does not establish Eighth Amendment claim). Consequently, the defendants' motion for summary judgment should be granted.[10]

---

[10]  Given the record in this matter, should the Court disagree with my recommendations to dismiss other defendants in this matter, I nonetheless recommend that summary judgment should be granted to them, because there is simply no evidence that any of them acted with deliberate indifference to Hairston's medical condition or needs, in accordance with the standards set forth in this section.

## VI. **Recommendation.**

Hence, for the foregoing reasons, IT IS RECOMMENDED that:

(1) The Defendants' Motion to Dismiss and for Summary Judgment (*Doc.*

107) be **GRANTED**; and

(2) All other motions be **DENIED** as moot.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **27th** day of **August, 2013**.

> ***S/ Susan E. Schwab***
> **Susan E. Schwab**
> **United States Magistrate Judge**